# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ANGEL DIX | CIVIL ACTION |
| VERSUS | |
| LOUSIANA HEALTH SERVICES & INDEMNITY COMPANY D/B/A BLUE CROSS/BLUE SHIELD OF LOUISIANA | NO.: 12-00319-BAJ-SCR |

## RULING AND ORDER

Before the Court are cross-motions for summary judgment, filed by Plaintiff Angel Dix ("Dix") and Defendant Blue Cross/Blue Shield of Louisiana ("BCBS"). These motions include Dix's **Motion for Summary Judgment (Doc. 51)**[1] and BCBS's **Motion for Summary Judgment (Doc. 50).**[2] Both motions request the Court grant summary judgment, pursuant to Federal Rules of Civil Procedure Rule 56, regarding BCBS's decision to deny Dix disability benefits. Oral argument is not necessary. Jurisdiction is proper under 28 U.S.C. § 1331.

## I.      Background

Dix worked for BCBS from 2006 to 2007. In 2000, she began to experience leg and back pain, which became progressively worse in 2007, when she underwent the first of three back surgeries. However, the surgeries failed to alleviate the pain. (Doc. 50-1, at 4.)

---

[1.] BCBS opposes the motion. (Doc. 58.)
[2.] Dix opposes the motion. (Doc. 55.)

On June 13, 2007, Dix applied for disability benefits under BCBS's long term disability ("LTD") program[3] where she was deemed disabled following examination. Dix started to receive benefits on December 1, 2007, until June 30, 2010. On July 7, 2010, the program informed Dix that she would no longer receive LTD benefits because the medical evidence no longer supported a finding of disability. *Id.* Throughout Dix's communications with the plan administrator, she continued to complain of leg and back pain and headaches. (Doc. 50-1, at 7.)

1. **Description of BCBS's Disability Plan**

The LTD benefits program, administered by the National Employee Benefits Administration ("NEBA") on behalf of BCBS, is governed by Employee Retirement Income Security Act ("ERISA"). (Doc. 50-1, at 5.) This program provides long term disability benefits to eligible employees. Barbara Grant ("Grant"), as the Assistant Secretary of the National Employee Benefits Committee ("NEBC"), was the official who was vested with the authority to decide all appeals under the program's ERISA Claims Procedures. The relevant part of the plan documents states:

> In its sole discretion, to make final and binding: (i) determinations of the entitlement of Participants to receive benefits hereunder; (ii) factual determinations; and (iii) Program interpretations. Similarly, in making decisions regarding such appeals, including Program interpretations, factual determinations and benefit entitlement decisions, the NEBC or its delegate shall have the authority to make such decisions in its sole discretion and its decisions shall be final and binding as to all persons.

---

[3.] "Program" and "plan" are both terms used to describe BCBS's disability plan. Both terms are used interchangeably in this ruling.

2

(Doc. 50-1, at 6.) An employee must meet a "disability standard" to receive benefits under the program. (Doc. 50-1, at 7.) The "participant must establish to the satisfaction of NEBA or the NEBC, as the case may be, on the basis of objective medical evidence satisfactory to NEBA or the NEBC (in its or their sole discretion) that he or she is unable to perform work up to the [standard applicable to him or her]." *Id.* Furthermore, a participant must be "wholly prevented by reason of mental or physical disability, from engaging in any occupation comparable to the occupation in which he or she was engaged for the Participating Employer at the time of, or immediately prior to the claimed onset of his or her Disability." *Id.* The program considers an occupation comparable if its earning potential is similar to the employee's salary range at the time the person became disabled. The program administrators have sole discretion to make benefits decisions.

### 2. The Plan Administrator's Review of Dix's Disability Claim

In examining Dix's disability claim, the plan administrator focused on whether Dix was disabled as of June 30, 2010 because Dix argued that she qualified for benefits beyond that date. (Doc. 50-1, at 8.) The administrator based the decision to terminate Plaintiff's benefits on the opinions and recommendations of George Jiha, M.D., of the Spine and Diagnostic Treatment Center ("Dr. Jiha"), a psychological evaluation by Curtis M. Vincent, Ph.D. ("Dr. Vincent"), the results of an Independent Medical Evaluation ("IME") by Randolph Roig, M.D. ("Dr. Roig"), the opinions of two physician advisors to the disability program, Richard P. Harris, M.D. ("Dr. Harris") and Terry Nicola, M.D. ("Dr. Nicola"). The plan administrator also

3

consulted a Transferrable Skills Analysis/Wage Earning Capacity Evaluation report ("TSA"). (Doc. 50-1, at 5.) Moreover, the administrator also considered medical records from Michael Dupre, M.D. ("Dr. Dupre"), who had previously treated an abscess in Dix's arm. However, Dr. Dupre declined to provide a work status recommendation for Dix and deferred to her infectious disease doctor. The Medical Review Committee ("MRC") did not receive additional evidence, doctor's notes, or work status recommendations from Dr. Dupre, despite its attempts to obtain such information. (Doc. 50-1, at 8.)

In reviewing the claim, the administrator received medical records from Dr. Jiha. Dix's treating physician, Dr. Kevin McCarthy ("Dr. McCarthy"), referred her to Dr. Jiha for an evaluation. After observing that she had degenerative spinal disease and recurring low back and left leg pain, Dr. Jiha recommended spinal cord stimulation therapy to alleviate the pain. Prior to the procedure, Dr. Jiha referred Dix to Dr. Vincent for a psychological evaluation to ensure she was mentally able to undergo the treatment. *Id.*

Dr. Vincent performed a psychological evaluation and concluded that Dix was not likely to have problems responding to the planned surgical procedure and supported Dr. Jiha's recommended course of treatment. However, Dix did not complete the procedure because she became very anxious and nervous. She did not follow up with Dr. Jiha or try to reschedule the procedure. (Doc. 50-1, at 9.)

In order to further evaluate Dix's claim, the administrator asked Dix to undergo an IME. *Id.* Dr. Roig performed the IME on April 27, 2010, during which he

4

analyzed Dix's medical history and performed his own physical examination, concluding that she was able to walk on heels and tiptoes, and her sensory deficits do not fit the typical pattern of degenerative disc disease. *Id.* He recommended that Dix receive a neurological pain evaluation. (Doc. 50-1, at 9-10.) Dr. Roig also concluded that "Dix was capable of full time light duty employment, with only one restriction of no bending at the waist." (Doc. 50-1, at 10.)

In light of Dr. Roig's medical opinions, the administrator asked one of the plan's physician advisors, Dr. Harris, to review Dr. Roig's findings and the IME, and to specifically address "Dr. Roig's recommendation for a neuropsychological pain evaluation." *Id.* Dr. Harris examined Dix's medical history, prior treatments, and Dr. Roig's findings. Dr. Harris noted that Plaintiff suffered from lower back pain, but no apparent serious trauma. *Id.* He concluded that Dr. Roig's diagnosis of degenerative disc disease did not necessarily indicate significant functional limitation and, from a physical perspective, there was no evidence of a disabling condition. He suggested that psychological factors should be considered as the basis for the disability, but there was no evidence to suggest a psychological element in the disability, in part, because Dix never sought psychotherapy. (Doc. 50-1, at 11.) The administrator concluded, based on Dr. Harris' assessment, that further neurological testing would not provide any additional insight. *Id.*

The administrator also asked another physician advisor, Dr. Nicola, to review Dix's records and provide an opinion on her condition. Dr. Nicola assessed records spanning the period from April 15, 2009 until June 9, 2010. On three separate

occasions, he wrote that there was "not enough to explain ongoing disability for sedentary level work." (Doc. 50-1, at 11-12.) He also agreed with Dr. Roig's conclusions, finding that "[Dix's] current condition does not demonstrate why she cannot sustain basic sedentary work with the precaution of avoiding repetitive lumbar flexion." (Doc. 50-1, at 12.) Dr. Nicola then recommended that her status be "not disabled" and not qualify for the Program benefits.[4] *Id.*

The administrator also considered office notes and an attending/consulting physician statement from Dr. McCarthy, Dix's treating physician since 2007. In a May 27, 2010 document, Dr. McCarthy wrote that the procedure attempted by Dr. Jiha was abandoned, and that he made recommendations for Dix to see Dr. Elizabeth Russo-Stringer ("Dr. Russo-Stringer") for comprehensive pain management. BCBS asserts that Dr. McCarthy did not provide his opinion regarding whether Dix could return to work. *Id.* Dix saw Dr. Russo-Stringer at Dr. McCarthy's request, but BCBS asserts that Dix did not provide the plan administrator with any evidence from these visits that would support her disability claim when the plan administrator initially reviewed her disability status. (Doc. 50-1, at 13.)

The plan administrator also considered a TSA Report when it evaluated Dix's disability status. The TSA report examined whether Dix could find comparable work in the Baton Rouge area that would allow for "no lumbar bending," that matched Dix's skill set, and that "paid wages comparable to those she earned while working

---

[4.] Ms. Dix argues that Dr. Nicola was not a "neutral examining physician" because she recommended video surveillance of Ms. Dix and had the same fax number as Ms. Grant. (Doc. 55, at 12.)

for [BCBS]." *Id.* The TSA report noted multiple job postings available that matched those criteria which demonstrated that Dix's condition did not prevent her from engaging in comparable work. *Id.*

The administrator decided to terminate Dix's LTD benefits on July 7, 2010, and informed Dix in the denial letter that her treating physicians provided no work status recommendations and that Dix provided no evidence that she could not perform "sedentary work." (Doc. 50-1, at 14.) Dix appealed the decision to Grant,[5] Director of Disability Services for NEBA and Assistant Secretary of the NEBC. (Doc. 50-1, at 6, 14.)

### 3. Grant's Consideration of Dix's Appeal for LTD Benefits

Grant considered the same evidence as the plan administrator in her review of the benefits decision, as well as medical records from Dr. Russo-Stringer, medical information from neurologist Ade Longe, and the opinion of a third physician advisor to the program, Scott Kale, M.D. ("Dr. Kale"). (Doc. 50-1, at 5.) She also considered Dix's subjective complaints of pain. (Doc. 50-1, at 14.) Dix informed Grant that her pain caused her children to miss school, but Dix also stated that she regularly drove her children to school and was not receiving any treatment other than pain medication. (Doc. 50-1, at 15.)

Grant also reviewed an office note from Dr. Russo-Stringer, Dix's treating physician, which stated that Dix would be "unable to do any job that requires heavy

---

[5.] Originally, Grant was a defendant in this case. However, the Court dismissed her from the case on the grounds that she was not a proper party. (Doc. 18.)

lifting, much bending, overhead work, and any standing or sitting for prolonged period of time" due to lower back pain. (Doc. 50-1, at 16.) However, Dr. Russo-Stringer did not make a determination that Dix could no longer work in any capacity. Grant also considered a July 2010 office note from Dr. McCarthy that Dix submitted, in which he recommended that "this patient not be involved in any type of employment at this time as she is on relatively heavy medications that may affect her cognition and she does continue to be symptomatic with most activities." *Id.* Grant eventually found, however, that none of the evidence provided by Dix during the appeals process supported a disabled status. (Doc. 50-1, at 15.)

Grant also asked Dr. Kale[6] to review and evaluate Dix's claim. (Doc. 50-1, at 16.) According to his report, on September 16, 2010, he called Dr. McCarthy and Dr. Russo-Stringer to discuss Dix's ability to return to work, and both doctors agreed that Dix "can return to work[that allows] her to stand and move about periodically." (Doc. 50-1, at 17.) Grant asserts that she relied on the treating's physicians' most recent work status recommendation outlined in Dr. Kale's report. Dr. Kale further concluded, independent of the treating physicians' opinions, that there were no significant medical issues that would prevent Dix from returning to work with appropriate restrictions. *Id.* Dix contests Dr. Kale's notes, which state that he spoke with both of Dix's treating physicians, as well as his assertion that the treating physicians stated she could return to work. (Doc. 51-1, at 4.) She argues that neither

---

[6.] Originally, Dr. Kale was a defendant in this case. However, the Court dismissed him from the case on the grounds that he was not a proper party. (Doc. 47.)

treating physician "released her to return to work." *Id.*

Grant asserted that she had multiple phone conversations with Dix throughout the appeals process. She informed Dix that she could change the appeal deadline to give her more time to submit evidence of her condition. Grant changed the appeal deadline but Dix did not provide additional evidence suggesting that she was disabled by the revised deadline. (Doc. 50-1, at 18.) In a November 19, 2010 letter, Grant affirmed the denial of benefits, and informed Dix that the decision was final. (Doc. 50-1, at 18.) The letter stated that she based the decision on the opinions of Dr. McCarthy, Dr. Russo-Stringer, Dr. Roig, Dr. Nicola, Dr. Harris, and Dr. Kale, each finding that Dix was not disabled as defined under terms of the Program and that she could resume full time employment. (Doc. 50-1, at 18-19.)

### 4. Procedural History

On May 31, 2012, Dix filed suit against BCBS, Grant, and Dr. Kale alleging fraud and wrongful termination of her LTD Policy benefits under 79 U.S.C. § 1132. (Doc. 1.) Claims against Dr. Kale and Grant have previously been dismissed. (Doc. 18, 47.) BCBS now moves the Court to grant summary judgment in its favor, asserting that Dix cannot meet her burden of proof in showing that the plan administrator arbitrarily and capriciously terminated her disability benefits. (Doc. 50-1, at 2.) Dix also moves the Court to grant summary judgment in her favor, asserting that BCBS's termination of her disability benefits was arbitrary and capricious, and that BCBS operated under a conflict of interest when it reviewed her claim, that BCBS ignored her favorable Social Security Administration ("SSA")

disability benefits award, and that BCBS ignored all of the medical evidence, including the opinions of her treating physicians, which supported her disability claim. (Doc. 51-1.) Based on the evidence presented and the applicable law, the Court concludes that there is no genuine issue of fact and BCBS is entitled to judgment as a matter of law.

## II.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Independent School District*, 113, F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The non-movant's burden, however, is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

III.  Analysis

## A. Whether NEBA/NEBC's Role as Plan Administrator and BCBS's Funding of the Benefits Program Created a Conflict of Interest

As an initial matter, the Court must determine whether NEBA/NEBC's role as plan administrator and BCBS's funding of the benefits program created a conflict of interest. *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008). Dix argues that BCBS operated under a conflict of interest because it "determined both whether [Dix] was eligible for benefits and also paid those disability benefits" and that, in doing so, BCBS abused its discretion. (Doc. 51-1, at 6-7.) BCBS asserts that no such conflict exists and that there was no abuse of discretion because NEBA is a non-profit entity and the benefits program is funded through a trust. (Doc. 58, at 13.)

A court must consider a plan administrator's conflict of interest when determining whether an administrator abused his or her discretion in denying a claimant benefits under ERISA. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A conflict of interest exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." *Metro. Life Ins. Co.*, 554 U.S. at 112.

In *Metro. Life Ins. Co.*, the United States Supreme Court examined an insurance company's potential conflict of interest when it served as both administrator and insurer of the employer's LTD plan and it denied an employee's benefits claim. The Court recognized that a clear conflict of interest occurs in the case

of an "employer that both funds the plan and evaluates the claims." *Id.* at 108, 112.[7] Other federal courts have found a conflict of interest when the employer itself, another company employee, or a committee acting on the employer's behalf serves as plan administrator and the employer also funds the benefits plan. *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (employer's human resources executive served as plan administrator); *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 248 (5th Cir. 2009) (employer's high level executive served as plan administrator); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1304 (5th Cir. 1994) (employer's Chief Medical Officer determined a party's benefits eligibility); *Greene v. Syngenta Crop Prot., Inc.*, 207 F. Supp. 2d 537, 543 (M.D. La. 2002) (benefits committee potentially included members of employer's Board of Directors acted as plan administrator).

In *Holland v. Int'l Paper Co. Ret. Plan*, the United States Court of Appeals for the Fifth Circuit found that a structural conflict of interest existed that could be important when evaluating the plan administrator's benefits decision. 576 F.3d at 248. The employer funded the disability plan "by making irrevocable, non-reversionary, periodic payments into a separate trust, from which all benefits [were] paid." *Id.* at 243. Furthermore, the employer's Senior Vice President-Human Resources served as the plan administrator. A company employee had the power to interpret the terms of the plan and decide on an employee's eligibility for disability

---

[7.] *See also Firestone Tire and Rubber Co.*, 489 U.S. at 115 (weighing company's role as administrator and payer of benefits in deciding whether company abused its discretion in denying employee benefits). *But see Maciejczak v. Procter & Gamble Co.*, 246 F. App'x 130, 132 (3d Cir. 2007) (finding that conflict of interests are more likely to arise in the cases of insurances companies being both the party that funds and administers the benefits plan).

benefits, thus creating a conflict of interest. *Id.*

Here, Dix argues that BCBS had a structural conflict of interest because it determined eligibility for disability benefits and *it* paid disability benefits. (Doc. 51-1, at 7.) The Court agrees that, like the employer in *Holland*, BCBS contributed to a trust that pays all disability benefits. BCBS's contributions also cover administrative expenses associated with the plan and, along with any investment income generated by the trust, are the sole source of the plan's funding. (Doc. 50-1, at 6.) Moreover, similar to the administrator in *Holland*, BCBS's plan administrator was affiliated with BCBS. BCBS's Board of Directors comprised the committee charged with administering the disability plan. The disability plan at issue here gave the NEBA and NEBC the role of plan administrator. Both entities had the sole discretion to interpret the terms of the plan, to determine an employee's eligibility for disability benefits and make decisions regarding any employee appeals. When Grant denied Dix's appeal for her LTD benefits, she acted on behalf of NEBC. (Doc. 50-1, at 6.)

Nevertheless, BCBS argues that no conflict of interest existed because the disability plan "is funded by a trust that is in turn funded by contributions from participating employers like [BCBS]." (Doc. 50-1, at 21 n.3.) BCBS further argues that it has no financial motivation to deny an employee's benefits claim because the NEBA is a "not for profit entity." *Id.* BCBS relies on the Fifth Circuit's ruling in *Holland* to support this argument. *Id.*

However, the Court notes that BCBS misinterprets the Fifth Circuit's holding. *Id.* In *Holland*, the court clearly stated that a structural conflict of interest existed. It

found that the establishment of a trust by the employer *lessens* the conflict of interest's impact on a decision to pay benefits, but the trust does not negate the conflict. The employer's "irrevocable and non-reversionary" contributions to the trust signified to the Court that the employer's conflict of interest did not impact the benefits decision, because the employer had little financial motive to deny claims. *Holland*, 576 F.3d at 249-50. BCBS provides no information regarding the specific details of its contributions for this Court to assess the financial motive it may or may not have for denying employees' benefits claims.

In either case, other federal courts of appeals support the conclusion that a conflict of interest may still exists despite the fact that a trust funds an employer's disability plan. *See Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1025 (9th Cir. 2008) (finding that a structural conflict of interest exists despite plan benefits being paid from a trust).

As such, consistent with the Court's finding in *Holland*, this Court finds that BCBS had a conflict of interest when it evaluated Dix's disability claim because it both funded the disability program and made benefits eligibility decisions.

Nevertheless, it is within the Court's discretion when deciding how to weigh the conflict in assessing the plan administrator's benefits decision. A conflict of interest will be one of many factors a judge considers in assessing the legality of a benefits denial decision. *Metro. Life Ins. Co,* at 115-17. A case's facts dictate how much weight the court should afford the conflict in its analysis of the benefits decision. *Holland*, at 248.

14

Conflicts of interest should be given more weight where the facts show that it likely affected the benefits decision. Such is the case "where an insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co.*, at 117. The Fifth Circuit permits a court to weigh a plan administrator's conflict of interest more heavily when the facts surrounding the decision suggest "procedural unreasonableness." *Truitt v. Unum Life Ins. Co. of Amer.*, 729 F.3d 497, 509-10 (5th Cir. 2013). A decision is procedurally unreasonable when the method utilized by the plan administrator to make the benefits decision was unreasonable. *Id.* On the other hand, a conflict of interest should be given little weight when an administrator actively attempts to make an accurate decision and reduce bias such as by "walling off claims administrators from those interested in form finances, or . . . imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." *Metro. Life Ins. Co.*, at 117.

In *Holland*, the Fifth Circuit gave little weight to an employer's conflict of interest. The court noted that the plan administrator submitted the employee's records to "independent medical professionals" whose compensation did not depend on the outcome of the case. *Holland*, at 249. Also, the employee presented no evidence regarding any financial benefits the employer would have received by denying the claim, how the conflict affected the decision, or any history of the administrator abusing its discretion. *Id.; see also Anderson*, 619 F.3d at 512 (holding that a conflict of interest was an insignificant factor because the employee could produce no evidence establishing that the conflict influenced the benefits decision and the plan

15

administrator consulted with independent experts prior to making the decision).

Alternatively, the Fifth Circuit weighed an insurance company's conflict of interest heavily when it ruled that an administrator improperly denied an employee's benefits claim in *Schexnayder v. Hartford Life and Accident Ins. Co.*, 600 F.3d 465 (5th Cir. 2010). Because the employer paid disability benefits directly, the Court reasoned that benefits decisions would directly affect the employer's "bottom line." *Id. at* 468, 470. In that case, the employer did not take any steps to mitigate the conflict's effect on benefits decisions. Therefore, the Court found that the employer's "financial bias" could have factored into its benefits decision, thereby making the conflict of interest "a more significant factor." *Id.* at 470-71.

Here, Dix urges the Court to accord BCBS's conflict of interest significant weight when reviewing the benefits decision, but she provides no evidence showing how the potential conflict affected the benefits decision. (Doc. 51-1, at 6-7.) Like the administrator in *Holland*, the NEBC, NEBA, and Grant thoroughly reviewed Dix's disability status by consulting with medical experts. *Holland*, 576 F.3d at 244. Grant took active steps to ensure the accuracy of the benefits decision by soliciting another medical opinion and remaining in constant communication with Dix. (Doc. 50-1, at 14, 16-17.) Thus, it is unlikely that a conflict of interest on the part of BCBS affected the benefits decision. Therefore, despite BCBS's conflict of interest when it evaluated Dix's disability claim in accordance with the Fifth Circuit's decision in *Holland*, the Court will not accord BCBS's conflict of interest significant weight when reviewing the benefits decision under the arbitrary and capricious standard of review

16

## B. Whether BCBS Arbitrarily and Capriciously Terminated Dix's LTD Benefits

### 1. Whether the Plan Administrator Should Have Allowed Dix to Supplement the Administrative Record

Prior to deciding whether BCBS arbitrarily and capriciously denied Dix's claim for LTD benefits, the Court examines Dix's assertion that the administrative record should be supplemented. Dix argues that, under the applicable law, the administrative record remains open until the filing of a lawsuit.[8] (Doc. 55, at 2.) Dix avers that the Defendant failed to consider additional evidence concerning her condition, and that such a failure is grounds for summary judgment. However, BCBS, argues that the administrative record only contains the information available to the plan administrator when it made its benefits decision. BCBS further asserts that it was not required to supplement the record before rendering its decision. (Doc. 50-1, at 24.)

"The administrative record consists of relevant information made available to the [plan] administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). The plan administrator identifies the scope of the administrative record, and then the claimant receives an opportunity to contest the completeness of the record. *Id.* However, once the administrative record is established, the district court cannot supplement it unless

---

[8.] In support of her argument, Dix directs the Court to *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir. 1999) and *Wildbur v. ARCO Chemical Co.*, 974 F. 2d 631 (5th Cir. 1992). (Doc. 55, at 2.)

the additional evidence either relates to the interpretation of the plan or further explains medical terms and procedures associated with the claim. "[T]he district court is precluded from receiving evidence to resolve disputed material facts—i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Id.*[9]

In *West v. UNUM Provident*, the Fifth Circuit further explained the narrow exceptions regarding the supplementation of the administrative record, as set forth in *Vega.* 275 F. App'x 292, 294 (5th Cir. 2008). There, a claimant wanted to supplement the record with a favorable SSA disability determination received after the administrator denied the disability claim. *Id.* The Court found that the SSA award did not fall under either exception. First, evidence relates to plan interpretation "when the plan administrator routinely follows or relies upon that evidence in interpreting the plan." *Id.* at 295. Because the claimant failed to provide evidence regarding the administrator's routine reliance on SSA findings when it interprets the plan, the Court decided that the SSA decision did not fall under this exception. Second, evidence relates to the medical terms and procedures associated with a claim "when the evidence aids the [d]istrict [c]ourt in understanding the technical aspects of the claim." *Id.* The SSA decision also failed to fall under this exception because the claimant could not provide evidence establishing how the decision would help the Court in further understanding medical terms and

---

[9] *See also Crosby v. Louisiana Health Serv. and Indem. Co.*, 647 F.3d 258, 263 (5th Cir. 2011) (reaffirming *Vega* holding that district court cannot supplement administrative record with evidence related to "whether coverage should have been afforded under the plan"); *Vencor Hosp.-Houston v. Seafarers Welfare Plan*, 244 F.3d 133, at *2 (5th Cir. 2000).

procedures associated with the claim. Therefore, the Court found that the judge properly denied the claimant's request to supplement the administrative record with this finding. *Id.*[10]

The Fifth Circuit has also prevented a claimant from supplementing the administrative record with medical records and doctors' notes and letters regarding a claimant's condition and treatment. *Anderson*, 619 F.3d at 517. In *Anderson*, the Court found that the claimant's additional evidence was "either cumulative of the earlier evidence or largely irrelevant" to the long term disability claim, and determined that the evidence was irrelevant to the case at hand because it failed to address the time period at issue. *Id.* at 516. The Court also dismissed Plaintiff's request to supplement the record with the doctors' letters, which stated that the claimant was "totally disabled." *Id.* at 517. Further, the Court found that a doctor's claim that a patient was "totally disabled" did not necessarily establish disability under a benefits plan because such a legal conclusion is left to a plan administrator. *Id.*

However, the Fifth Circuit has allowed a claimant to supplement the administrative record with doctors' affidavits in limited circumstances. The claimant was required to provide evidence that the affidavits were presented to the plan administrator prior to filing the lawsuit in a manner that gave the administrator

---

10. *See also Horton v. Prudential Ins. Co. of Amer.*, 51 F. App'x 928, at *3 (5th Cir. 2002) (holding that the district court should not consider a SSA disability decision made after an administrator's denial of appeal when the decision was not before the administrator and the evidence relates to the merits of the plaintiff's case).

sufficient time to consider them. *Vega,* at 300. However, the claimant provided no such evidence, so the Court affirmed the district court's ruling that the affidavits should not be included within the administrative record. *Id.* at 303, n.10.[11]

Here, Dix relies on the ruling in *Vega,* arguing that case law supports the proposition that the administrative record can remain open until a claimant files a lawsuit. (Doc. 55, at 2.) However, unlike the situation presented here, the claimant in *Vega* did not exhaust the administrative appeals process prior to filing a lawsuit. *Vega,* at 290. Also, the claimant in *Vega* did not ask the plan administrator to review its decision and immediately pursued legal action to receive her LTD benefits. *Id.* The *Vega* court allowed the claimant to supplement the administrative record because it wanted to encourage claimants' attorneys "to make a good faith effort to resolve the claim with the administrator before filing suit in district court." *Id.* at 300. In this case, the plan administrator could not reconsider its decision because Dix exhausted her administrative appeals. Grant, as the official who denied Dix's final appeal, informed Dix that the only other way for her to recover her LTD benefits would be to pursue legal action. (Doc. 52-1, Exhibit A, at 3.) Moreover, at no point throughout the administrative process did Dix contest the completeness of the administrative record. (Doc. 52-1, Exhibit A, at 2.)

---

[11.] *See also Corry v. Liberty Life Assurance Co. of Boston,* 499 F.3d 389, 403 (5th Cir. 2007) (concluding that district court properly supplemented the administrative record with doctors' affidavits because the claimant submitted them to the administrator in a timely manner that gave the administrator over a year before filing the lawsuit to reconsider its decision). *But see Vencor Hosp.-Houston v. Seafarers Welfare Plan,* 244 F.3d 133, at *2 (5th Cir. 2000) (holding that the district court could not consider "deposition and affidavit evidence" elicited after the plan administrator made its benefits decision because the evidence concerned the "disputed issue of material fact regarding the claim," which is not allowed under *Vega*).

Dix argues that she should be able to supplement the record because she provided the additional documents to Grant prior to filing the lawsuit. (Doc. 55, at 2.) The Court agrees that *Vega* allows a party to supplement the administrative record if it provides the additional information to the administrator "in a manner that gives the administrator a fair opportunity to consider it," which typically occurs prior to the claimant filing a lawsuit. *Vega*, 188 F.3d at 300. However, the Fifth Circuit did not define "fair opportunity." *Id.*

In *Hamburg v. Life Ins. Co. of North Amer.*, the Fifth Circuit upheld a district court's ruling preventing a claimant from supplementing the administrative record with a favorable SSA disability award that came after the administrator denied the appeal for his disability benefits. *Hamburg v. Life Ins. Co. of North Amer.*, 470 F. App'x 382, 385-86 (5th Cir. 2012). The Court found that the claimant had eighteen months from when he received the award to when he filed the lawsuit to provide the administrator with the additional information, and Plaintiff's failure to do so within eighteen months was "inexcusable." *Id.* at 385-86. Similarly, in *McDonald v. Hartford Life Grp. Ins. Co.*, the Fifth Circuit denied a claimant's appeal to supplement the administrative record with a favorable SSA disability award that the claimant received one year after the administrator made the final benefits decision. 361 F. App'x 599 (5th Cir. 2010). The award was not brought to the administrator or court's attention until two years after the claimant received it, which was considered untimely under the circumstances. *Id.* at 606-07.

However, the Fifth Circuit has identified situations where it was appropriate

21

to supplement the administrative record, but under limited circumstances. In *Hargrave v. Commonwealth General Corp.'s Long Term Disability Plan*, the Fifth Circuit allowed the claimant to supplement the administrative record with correspondence that was not part of the original record before the administrator, at the time it denied the claimant's appeal. 430 F. App'x 256, 259 (5th Cir. 2011). The administrator denied the appeal in December 2007 and the claimant wanted to add correspondence to the record that occurred in June 2008, six months after the denial of the appeal. *Id.* at 258. The Court found it significant that the additional documents were dated prior to the claimant filing suit and provided to the administrator in a way that gave it a fair opportunity to consider it. *Id.* at 259.

Here, however, like the claimant in *Hamburg*, Dix's attempt to supplement the administrative record occurred over a year after Grant issued the final appeal. *Hamburg*, 470 F. App'x at 386. Approximately one year and three months elapsed between the time Grant denied Dix's final appeal and when Dix's attorney attempted to supplement the administrative record. Grant denied Dix's final appeal in November 2010, and on January 27, 2012, Dix's attorney asked Grant to add additional documents to the administrative record and reconsider her decision. (Doc. 53-4, Exhibit H, at 104, Doc. 52-2, Exhibit B, at 20.)

Moreover, Dix only sought to add the documents to the administrative record that supported her disability claim after she received a favorable SSA disability award she received on September 19, 2011. (Doc. 51-1, at 7.) Dix had ample opportunity to bring her SSA disability award and the other medical evidence to

Grant's attention prior to sending the letter in January 2012, which may have produced a different finding. However, such is not the case. Her delay is legally inexcusable.

Moreover, despite providing the additional evidence to Grant before filing this lawsuit, Dix did not provide the documents to Grant in a manner that would have given her a fair opportunity to reconsider her decision, given the length of time that elapsed between the denial of the final appeal and the January 27, 2012 letter from Dix's attorney to Grant. Therefore, the Court finds that, in order to supplement the administrative record with the additional evidence, the evidence must fall within one of the two narrow exceptions outlined in *Vega,* requiring that the additional evidence (1) either relate to the interpretation of the plan, or (2) further explain medical terms and procedures associated with the claim.

Specifically, Dix seeks to supplement the administrative record with additional medical records, MRIs, and X-Rays administered by Dr. McCarthy, affidavits from Dr. McCarthy and Dr. Russo-Stringer, and a favorable SS disability decision. (Doc. 52-2, Exhibit B at 20.) The medical evidence that Dix now seeks to include in the administrative record pertains to her disability diagnosis and inability to work any job. Yet, this is not evidence that would aid the Court in interpreting medical terms or procedures related to the claim. Rather, the evidence refers more to the disputed issue of whether Dix is disabled. (Doc. 52-2, Exhibit B, at 20.) Stated another way, Dix seeks to now supplement the record with information that relates to the *merits* of her claim, which squarely falls outside the exceptions outlined in

23

*Vega.*

Regarding the favorable SSA award that Plaintiff received months after her final appeal was denied, the Court will follow Fifth Circuit rulings in concluding that the SSA finding does not fall under either *Vega* exception, because it does not relate to or affect a plan administrator's interpretation of the disability plan, nor does it aid the Court in understanding medical terms and procedures associated with the claim. *West,* at 295. As such, the Court will not permit Dix to supplement the administrative record with the additional documentation.

### 2. Whether the Court Should Consider the Plan Administrator's Failure to Consider Dix's Favorable SSA Finding

Dix argues that the Court should consider the favorable SSA disability finding she received and the administrator's failure to consider the award when assessing the arbitrariness and capriciousness of the benefits decision. (Doc. 51-1, at 7.) BCBS argues that the SSA finding is "not dispositive of Dix's disability status during the relevant time frame" and that the award is not "part of the administrative record." (Doc. 58, at 3.)

A plan administrator's failure to consider a contrary SSA award in its benefits decision can be "an important factor in its own right (because it suggest[s] procedural unreasonableness)" and it "justifie[s] the court in giving more weight to [a] conflict [of interest]." *Metro. Life Ins. Co.,* at 118. The Fifth Circuit has found that an administrator's failure to address an SSA award that conflicted with its benefits decision was unreasonable despite substantial evidence that supported its decision.

24

*Schexnayder*, at 471. The Court stated that an administrator's failure to consider the favorable SSA award that conflicted with its benefits decision was "procedurally unreasonable" and, "[a]lthough substantial evidence supported [the administrator's' decision, the method by which it made the decision was unreasonable . . . [leading the Court] to conclude that [the administrator] abused its discretion." *Id.*[12]

However, the SSA award in this case came several months after Grant and the plan administrator made the benefits determinations. In these instances, courts make case-specific inquiries into whether a plan administrator should have considered the award and whether a failure to do so renders its benefits decision arbitrary and capricious.

When presented with this issue, the Fifth Circuit has routinely held that a plan administrator's failure to consider an SSA disability award received after the administrator denied disability benefits is reasonable and not arbitrary or capricious. In *Marrs v. Prudential Ins. Co. of Amer.*, the Fifth Circuit held that a contrary SSA disability award does not prove that an administrator abused its discretion in rendering its benefits decision when "no evidence in the administrative record . . . support[s] it" and when the plaintiff did not submit "evidence of any contrary [SSA] determination . . . to [the] . . . plan administrator when it denied [the plaintiff's] benefits." 444 F. App'x 75, 77 (5th Cir. 2011). The plaintiff failed to show that the

---

[12.] *But see Curley v. Sedgwick Claims Mgmt. Servs. Inc.*, 507 F. App'x 354, 357 (5th Cir. 2013) (upholding plan administrator's benefits decision despite a failure to include SSA award in its decision because the administrator "was not in a position to benefit financially from both finding [the claimant] disabled under the SSA and not disabled under the [p]lan," and the SSA determination rests on a different legal standard and covered a different time period and different medical evidence than [the administrator's] ultimate decision").

SSA made any disability determinations contrary to the administrator's findings at the time the administrator found the plaintiff to be ineligible for disability benefits. *Id.*

Here, unlike the insurance company in *Schexnayder*, Grant did not have the SSA finding available to her when she reviewed the benefits decision and administrative record. The SSA found Dix disabled and entitled to SSA benefits on September 19, 2011, ten months after Grant affirmed the denial of Dix's disability benefits on November 19, 2010. (Doc. 51-1, at 7, Doc. 50-1, at 18.) Grant did not have this information available to her when making her determinations. Thus, the plan administrator was not required to consider Dix's contrary SSA disability award because it was not available to the administrator or to Grant when it reviewed Dix's claim.

However, some courts in the Fifth Circuit weigh an administrator's failure to consider a contrary SSA award received after the final benefits decision when the claimant informs the administrator of the award prior to litigation, and the administrator acknowledges the claimant's receipt of the award. Like the attorney in *Mercer,* Plaintiff's attorney requested that Grant review the SSA's disability finding and reconsider the decision after Dix exhausted her administrative appeals but prior to litigation. Dix's attorney enclosed the first page of the favorable SSA award letter in the January 27, 2012 letter to Grant, which also asked Grant to include the award

letter in the administrative record and reconsider her denial of Dix's final appeal.[13]

(Doc. 52-2, Exhibit B, at 20.) However, unlike the administrator in *Mercer*, Grant did

not acknowledge Dix's receipt of the SSA disability benefits. *Mercer*, 874 F. Supp. 2d

at 624-25. In Grant's February 10, 2012 letter to Dix's attorney, rather than

acknowledge Dix's SSA award, Grant stated:

> With your letter, you submitted 700 pages of documents
> and two compact disks that you insist must be considered
> as part of the administrative record of a final benefit denial
> communicated to [Dix] in mid-November of last year . . .
> Except for any documents in the 700 pages which may
> merely be copies of documents before the fiduciary last
> November, we must decline to consider the documents we
> received from you earlier this month as a part of the
> administrative record of the fiduciary's decision in
> mid-November of 2011 [sic].

(Doc. 52-2, Exhibit B, at 6.)

Grant could not reconsider the benefits decision with the SSA letter provided

by Dix's attorney after her final appeal was denied, because Dix never provided

Grant the full SSA award letter containing the SSA's reasoning for awarding Dix

disability benefits. Providing the full SSA award letter would have allowed the plan

administrator to compare the SSA's findings with its own to determine whether the

SSA defines "disability" in a similar manner to the disability plan at issue. *Lowery v.*

*McElroy Metal Mill Inc.*, No. 11-1491, 2013 WL 1197234, at *9 (W.D. La. 3/25/13).

Here, the award letter provided by Dix's attorney to Grant does not describe the

evidence that the SSA considered in concluding that Dix was entitled to SSA

---

[13.] This letter predated the start of this litigation, which was May 31, 2012. (Doc. 1-1.)

disability benefits. (Doc. 52-2, Exhibit B, at 23.)

Further, even if Dix had provided Grant with the full SSA award letter, the SSA findings are not binding on Grant. While SSA disability findings are "'relevant and instructive' in a Court's determination of whether a plan administrator acted arbitrarily and capriciously," it is well established that "Social Security determinations are not binding upon a plan administrator." *Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 788 (M.D. La. 2007) (quoting *Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex. 2005); *Horton v. Prudential Ins. Co. of Amer.*, 51 F. App'x at *3 ("while an EIRSA plan administrator might find a social security disability determination relevant or persuasive, the plan administrator is not bound by the social security determination."); *Williams v. Hartford Life Ins. Co.*, 243 F. App'x 795, 797 n.1 (5th Cir. 2007) (plan administrator was "not required to defer to a Social Security ruling.")

Nevertheless, an SSA determination that an individual is disabled, is "relevant and instructive" to the Court's conclusion of whether an administrator "acted arbitrarily and capriciously." *Glenn v. MetLife*, 461 F.3d 660, 666-67 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008). Although, an SSA finding "is not dispositive of a disability determination under an ERISA plan," a court may give it significant weight because an impartial administrative law judge makes SSA disability decisions. *Id.* However, this Court is not required to afford any weight to the award. Here, Dix failed to submit the full award letter for the Court to factor any SSA findings into its decision. Therefore, even if the Court were to find that a review of

28

the SSA determination is absolutely necessary, the Court cannot account for the reasoning behind the SSA's disability decision because such documents are not in evidence. Thus, it will not consider the award in its analysis of BCBS's benefits decision.

### 3. Whether Substantial Evidence Supported the Plan Administrator's Decision

The Court now turns to the merits of the claim. Both parties agree that the Court should review the plan administrator's denial of Dix's long-term disability benefits under an "arbitrary and capricious standard" of review because the benefits plan gives the administrator "discretionary authority" to interpret plan terms. (Doc. 50-1, at 19.)

When a benefits plan gives the plan administrator discretionary authority, as in this case, the benefits decision should be reviewed under an abuse of discretion standard of review. *Firestone Tire and Rubber Co.*, at 111. Applying the abuse of discretion standard requires the Court to employ a two-part test. First, the Court examines the plan administrator's interpretation of the plan. Second, it must examine the facts surrounding the benefits decision to determine if the administrator incorrectly interpreted the plan. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637-38 (5th Cir. 1992). In this case, Dix makes no assertions that the administrator incorrectly interpreted the plan's terms. Instead, she argues that the administrator's factual conclusion, that she did not meet the plan's disability standards, is incorrect. (Doc. 51.)

"An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d at 398 (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir. 1996)). Furthermore, a benefits decision is not arbitrary and capricious if it is supported by "substantial evidence." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)).

In support of her position as to why the plan administrator's decision was arbitrary and capricious, Dix argues that BCBS ignored the opinions of her treating physicians. Specifically, she asserts that the findings of Dr. McCarthy and Dr. Russo-Stringer were not fairly considered in conjunction with the opinions of BCBS's doctors. (Doc. 55, at 2.) The Supreme Court and the Fifth Circuit have rejected any proposition that a plan administrator must attach significant weight to a party's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *e.g.*, *Becknell v. Long Term Disability Plan for Johnson & Johnson and Affiliated Companies*, 510 F. App'x 317, 320 (5th Cir. 2013). Nonetheless, the Supreme Court has also held that plan administrators cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, at 834.

In this case, BCBS's plan administrator and Grant gave credit to all medical evidence provided by Dr. McCarthy and Dr. Russo-Stringer in the denial letters under the headings "Evidence Considered" and "Evidence Reviewed on Appeal," respectively. (Doc. 53-2, Exhibit F, at 53; Doc. 53-4, Exhibit H, at 104.) In the initial denial letter, BCBS's plan administrator stated that, in "determin[ing] that the medical evidence no longer support[ed] . . . [ Dix's] disability status," it considered: "[m]edical records from Kevin P. McCarthy, MD, and Marc Pitre, PA-C, Bone and Joint Clinic of Baton Rouge, Inc., including: [u]ndated Attending/Consulting Physician Statement (LTD-4M) received 03/12/10 [and] [o]ffice visit notes and reports, 03/27/09 through 5/27/10." (Doc. 53-2, Exhibit F, at 53.) Grant's letter affirming the denial of disability benefits reflects that she further considered medical records from Dr. Russo-Stringer, including office visit notes and an MRI report of the thoracic spine, as well as additional medical information from Dr. McCarthy, including an Attending/Consulting Physician Statement and a narrative regarding Dix's condition, treatment, and work status recommendation. (Doc. 53-4, Exhibit H, at 105.)

Furthermore, "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans." *Corry*, 499 F.3d at 401. The Fifth Circuit allows an administrator to rely on the reports of medical professionals even when their opinion conflicts with that of a treating physician, in cases where a medical professional only reviews a claimant's file but does not physically examine him. *Gothard v. Metro. Life Ins. Co.*,

31

491 F.3d 246, 249 (5th Cir. 2007.) Therefore, the administrator's decision to deny Dix disability benefits was not *per se* arbitrary and capricious, solely because it afforded more weight to the reports of BCBS's physicians than that of Dix's treating physicians.

The Court further examines whether the other evidence in the record supports the administrator's decision to deny Plaintiff's disability benefits. The Fifth Circuit has held that "the law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence . . . exists to support the employee's claim of disability." *Corry*, at 402.

The Fifth Circuit has upheld a plan administrator's decision to deny benefits to a party suffering from degenerative disc disease disability benefits. *McDonald*, at 601. The claimant argued that the administrator abused its discretion in denying her disability benefits because it had physicians who were biased against her review her records and render opinions on her condition. She further alleged that the administrator did not order her to undergo a physical examination, did not consider her "subjective complaints of pain, and that the evidence, in general, did not support the decision. *Id.* at 609-14. The Court dismissed the argument that the physicians were biased because the claimant failed to provide evidence to establish how the physicians received benefits from diagnosis that included findings that claimants were able to work or to point to evidence that proved a financial arrangement between the doctors and the plan administrator. *Id.* at 610.

Alternatively, in *Scheuerman v. Unum Life Ins. Co. of Amer.*, the Fifth Circuit vacated a district court's ruling that an administrator did not abuse its discretion in denying a disability claim. 384 F. App'x 422, 423 (5th Cir. 2010). The Court found that the medical reports relied upon by the administrator in concluding that the objective medical evidence failed to support the person's disability claim were vague, incomplete, and, in some instances, erroneous. *Id.* at 426-28. The administrator requested that the claimant undergo an independent medical examination. However, the physician who performed the exam did not provide a definitive opinion on the claimant's "functional capabilities," and he further concluded that a review of the patient's earlier MRIs was required to render a more accurate opinion. *Id.* at 426-27.

However, at the request of the administrator, the physician provided an addendum, which concluded that the patient could perform light duty work, yet the physician never received the additional information he requested to conduct an additional analysis to support this conclusion. *Id.* at 426. The Court held that the conflicting reports from the same physician who performed the independent medical exam supported the Plaintiff's argument that the administrator abused its discretion in denying the claimant's disability benefits. *Id.* at 427. Furthermore, other medical reports contained in the administrative record revealed additional errors. Two doctors misstated the position of the disc herniation while another misstated the number of surgeries performed on the claimant. These errors, combined with the conflicting medical reports from the same doctor, led the court to find that no "concrete evidence" supported the administrator's benefits decision. *Id.* at 428.

Like the claimant in *Corry*, at 392, Dix received disability benefits for a period of time before they were terminated. Dix received LTD benefits from December 1, 2007 to June 30, 2010. Her medical records supported the benefits until the plan administrator terminated them on June 30, 2010, following the finding that she was no longer disabled as defined by the plan. (Doc. 50-1, at 4-5.) Like the administrator in *Corry*, the BCBS plan administrator reviewed reports from three medical specialists, one of which actually examined Dix. In addition, medical information from Dix's treating physicians was also considered, along with supplemental evidence provided by Dix, including her subjective complaints of pain, and a report compiled by a vocational expert. The three medical professionals who reviewed Dix's medical records at the request of the plan administrator formed the same opinion that she could "sustain employment from a light duty position, that does not require lumbar bending." (Doc. 53-3, Exhibit G, at 4; Doc. 50-1, at 9-12.) The vocational report, which contained three available jobs in the Baton Rouge area that met Dix's work restrictions for her back condition and fit her salary requirements and qualifications, also confirmed that she would be able to perform comparable work. (Doc. 53-4, Exhibit H, at 42-45.)

Furthermore, like the extensive investigation conducted by the administrator in *Corry*, Grant conducted her own thorough investigation when she reviewed the administrator's benefits decision. First, Grant considered all additional evidence that Dix submitted when reviewing the benefits decision, which included office notes from a neurologist and ophthalmologist along with additional notes from her treating

physicians that were dated after the administrator terminated her benefits in July 2010. Grant also informed Dix that she could extend the appeal deadline to allow her more time to submit evidence supporting her belief that her condition prevented her from returning to any type of employment. Grant extended the appeal deadline, but Dix failed to submit any additional documentation. (Doc. 50-1, at 14-18.) Grant also accounted for all of Dix's subjective complaints of pain made during their contact throughout the appeals process. This is evident in Grant's letter to Dix affirming the termination of her disability benefits when she wrote "[t]he MRC previously denied your request for continued LTD benefits for multiple complaints and symptoms including: leg, back and hip pain; and headaches" and when Grant both considered the letter that Dix wrote to her in consideration of her appeal and information that Dix provided over the phone during the appeals process. (Doc. 53-4, Exhibit H, at 104-05.)

Also, Grant commissioned another physician, Dr. Kale, to review Dix's medical reports and the evidence to ensure that the administrator made the correct decision. Dr. Kale affirmed, both after speaking with Dix's two treating physicians and independent of their opinions, the opinions of the other three doctors that "Dix was capable of employment." (Doc. 50-1, at 17.) Dix disputes that her treating physicians spoke to Dr. Kale and that they agreed that she could return to modified work. (Doc. 51-1, at 3.) However, on September 27, 2010 (over a month before Grant denied the appeal), Grant informed Dix that her treating physicians stated she could return to work in a discussion with Dr. Kale. (Doc. 52-1, Exhibit A, at 3.) Grant gave Dix a

reasonable amount of time to dispute Dr. Kale's assertion with additional evidence when Grant amended the appeal deadline to October 18, 2010. However, Dix failed to submit contrary evidence that Dr. McCarthy and Dr. Russo-Stringer never agreed that she could return to work. (Doc. 52-1, Exhibit A, at 2-3.) Instead, Dix waited until January 3, 2012, approximately a year and two months after she exhausted her final appeal, to obtain signed affidavits for reconsideration from the doctors stating that they could not recall a conversation with Dr. Kale in September 2010. (Doc. 52-2, Exhibit B, at 20, 27, 47.)

In addition, like the claimant in *McDonald*, Dix argues that the administrator erroneously relied upon medical evidence and opinions from biased physicians. Dix argues that the administrator arbitrarily and capriciously denied her disability claim by solely relying on the opinions of doctors who were paid by BCBS to render their opinions on her back condition. (Doc. 55, at 2-3.)

However, this argument is unavailing because Dix provides no evidence in the record to support this assertion. The evidence in the record fails to show any financial arrangement between BCBS and the three physicians that would give the physicians an incentive to give an inaccurate opinion regarding Dix's back condition. Furthermore, like the treating physicians in *McDonald*, the record reflects that Dix's treating physicians made conflicting statements. Only after the administrator terminated Dix's disability benefits did Plaintiff provide office notes from both Dr. Russo-Stringer and Dr. McCarthy. Dr. Russo-Stringer's note stated that Dix "would be unable to do any job that requires heavy lifting, much bending, overhead work,

36

and any standing or sitting for [a] prolonged period of time." (Doc 50-1, at 16.) That note did not indicate that Dix could not resume modified employment. Dr. McCarthy's note stated "that [ Dix] not be involved in any type of employment at this time as she is on relatively heavy medications that may affect her cognition and she does continue to be symptomatic with most activities." (*Id.*) However, both doctors, in September 2010, during their phone conversation with Dr. Kale, contradicted those statements when Dr. Kale stated that he "obtain[ed] the treaters' concurrence that Dix can return to work permitting her to stand and move about periodically." (Doc. 50-1, at 17.) Although the treating physicians' self-serving affidavits refute this, it remains an insignificant factor, given the amount of medical evidence provided to support the plan administrator's findings of Plaintiff's work capabilities. Regardless, Grant was within her rights to attach more weight to the most recent recommendation. *Id.*

Finally, Dix disputes the findings of Dr. Roig's IME. However, the Court concludes that the evidence in the record provided by Dr. Roig, as well as the administrator's use of Dr. Roig's examination recommendation, was reasonable and not contrary to law. Dr. Roig gave a concrete opinion as to Dix's ability to return to work after examination, stating in his report that:

> Given the common nature of lower back pain, it is unlikely that a lower back, pain condition . . . would be a preclusive factor to gainful employment at a light duty job. I do not identify any physical reason why Dix could not sustain employment from a light duty position, that does not require lumbar bending.

37

(Doc. 53-3, Exhibit G, at 4.) Also, Dr. Roig stated in his report that "a neuropsychology pain evaluation *may be helpful* in elucidating the extent of any impairment related to her painful condition" and that an "electrodiagnostic study *could be useful* in attempting to confirm the presence of radiculopathy," not that any of those additional measures were required before he could give his medical opinion regarding Dix's condition. (Doc. 53-3, Exhibit G, at 3-4.) (emphasis added). It is apparent from the record that Dr. Roig gave an opinion utilizing all of the necessary information available to him, and made an objective medical finding based on Dix's condition at the time of examination.

Based on the facts, evidence in the record, and applicable law cited herein, the Court finds that BCBS did not arbitrarily and capriciously deny Dix's claim for disability benefits. Substantial evidence in the administrative record supports BCBS's decision terminating Dix's benefits in 2010, and Plaintiff has failed to establish that there was an abuse of discretion. The Defendant, Blue Cross/Blue Shield's, Motion for Summary Judgment on this claim is GRANTED, and this claim is dismissed.

## IV.  Conclusion

Accordingly,

**IT IS ORDERED** that Defendant Blue Cross/ Blue Shield of Louisiana's **Motion for Summary Judgment (Doc. 50)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Angel Dix's **Motion for Summary Judgment (Doc. 51)** is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Angel Dix's **Motion for Oral Argument (Doc. 57)** is **DENIED.**

**IT IS FURTHER ORDERED** that the claims against Defendant Blue Cross/ Blue Shield of Louisiana outlined herein are **DISMISSED**.

Baton Rouge, Louisiana, this _25th_ day of September, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**